IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JOAN RICKERT, | ) | |
| | ) | |
| Plaintiff, | ) | 8:07CV334 |
| | ) | |
| v. | ) | |
| | ) | |
| MIDLAND LUTHERAN | ) | MEMORANDUM AND ORDER |
| COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |

INTRODUCTION

The plaintiff has filed claims alleging disability discrimination in violation of the Americans With Disabilities Act, 42 U.S.C. §§ 12101 et. seq. ("ADA") and/or the Nebraska Fair Employment Practice Act, Neb. Rev. Stat. §§ 48-1101 et. seq. ("NFEPA").  Plaintiff alleges she has a disability due to breast cancer, and the defendant Midland Lutheran College ("Midland") refused to employ her as a full-time head volleyball coach or Student Activities Director, and removed plaintiff from the part-time positions she held in these jobs, because of her breast cancer and cancer treatment.  The plaintiff further alleges age discrimination, claiming she is a protected person under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et. seq. (the "ADEA") and the Nebraska Age Discrimination in Employment Act, Neb. Rev. Stat. §§ 48-1001 et. seq. (the "NADEA"), who was qualified to perform the duties of a full-time Student Activities Director and/or full-time head volleyball coach, but Midland refused to employ the plaintiff in these positions due to plaintiff's age, and hired substantially younger and less qualified people instead.

Pending before me is the motion for summary judgment filed by defendant Midland.  (Filing No. 58).  Midland claims the undisputed evidence establishes the

plaintiff did not have a "disability" as that term is defined under the ADA and NFEPA, and she suffered no adverse employment action due to any alleged disability. As to plaintiff's age discrimination claim, Midland acknowledges the plaintiff was over forty years old and qualified to be the full-time head volleyball coach or Student Activities Director, but substantially younger people were hired for these positions. However, Midland claims it had a legitimate nondiscriminatory reason for not hiring the plaintiff, and the plaintiff cannot offer any evidence that this proffered reason was mere pretext for age discrimination.  For the reasons discussed below, the court will grant the defendant's motion for summary judgment.

## STANDARD OF REVIEW

A motion for summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).  In response to the moving party's evidence, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'"  Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

> Once the moving party has met its burden of showing the absence of a genuine issue of material fact and an entitlement to judgment as a matter of law[,] . . . the non-moving party may not rest on the allegations of [the] pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.

Krein v. DBA Corp., 327 F.3d 723, 726 (8th Cir. 2003).

Although "summary judgment should seldom be granted in discrimination cases," (Bassett v. City of Minneapolis, 211 F.3d 1097, 1099 (8th Cir. 2000)), summary judgment should be granted in a discrimination case when the plaintiff has failed to present "any significant probative evidence tending to support the complaint," or has failed to "make a sufficient showing on every essential element of its claim on which [plaintiff] bears the burden of proof." Buettner v. Arch Coal Sales Co., Inc., 216 F.3d 707, 718 (8th Cir. 2000). "[T]he focus of inquiry at the summary judgment stage 'always remains on the ultimate question of law:  whether the evidence is sufficient to create a genuine issue of fact as to whether the employer intentionally discriminated against the plaintiff because of [the protected characteristic].'" Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1018 (8th Cir. 2005) (quoting Rothmeier v. Investment Advisers, Inc., 85 F.3d 1328, 1336-37 (8th Cir. 1996)).

## STATEMENT OF FACTS

The following summarizes the undisputed material facts and those facts favoring the plaintiff and therefore considered undisputed for the purposes of this motion.  Except to the extent they provide context, nonmaterial facts and facts not referred to by either party in presenting this motion to the court are not included in the summary or considered by the court.

The plaintiff's employment for Midland began when she was hired as a part-time assistant volleyball coach in August of 1997. Filing No. 60-3 (Rickert depo.), at 10:8-16).  The plaintiff was hired as the part-time head volleyball coach for Midland in 1999.  Filing No. 67-2 (Rickert declaration), at ¶ 6.

Steve Schneider ("Schneider") was the Athletic Director and head football coach for Midland when the plaintiff was initially hired, and he was plaintiff's immediate supervisor throughout her employment as a volleyball coach for Midland.

-3-

Filing Nos. 60-3 (Rickert depo.), at 50:11-23; 60-4 (Schneider depo.), at 13:2-6.  At the time Rickert was first hired, Schneider stated he intended to someday make the head volleyball coach position full-time, and if that happened, the position would be open to all potential applicants and the plaintiff could apply.  Filing Nos. 60-3 (Rickert depo.), at 40:8-18;  60-4; (Schneider depo.), at 48:16-21).   Rickert knew some of the full-time coaches at Midland not only coached, but taught classes, and she therefore believed any full-time volleyball coaching position would include teaching duties.  Filing No. 67-2 (Rickert declaration), at ¶¶ 26-29.  However, some of Midland's full-time coaches did not have teaching responsibilities.  Filing No. 60-6 (Kramme depo.), at 4:17-6:5.

In 2000, Rickert was hired as Midland's part-time Student Activities Director which, in combination with her part-time head volleyball coaching position, afforded her full-time employment for Midland.  Filing No. 60-3 (Rickert depo.), at 11:6-11.

The plaintiff was diagnosed with breast cancer in June of 2003, (filing nos. 60-3 (Rickert depo.), at 11:17-24; 67-2 (Rickert declaration), at ¶ 7), and had a partial mastectomy on July 2, 2003.  Filing No. 67-2 (Rickert declaration), at ¶ 7.  Although she was hospitalized for three days due to her surgery, she did not miss any work because the surgery occurred in the summer and she was employed by Midland on a ten-month contract.  The plaintiff attended a symposium for Midland within fifteen days following her surgery, (filing no. 60-3 (Rickert depo.), at 13:10-14:3), and by late July, was back on the volleyball court.  Filing No. 60-3 (Rickert depo.), at 21:1-8.

Rickert began chemotherapy treatments on August 1, 2003.  Four two-hour treatments were administered every third Monday morning, the last one occurring on September 29, 2003.   Filing No. 67-2 (Rickert declaration), at ¶ 8.   These chemotherapy treatments went "very well," causing only minor nausea, and no emesis or mucositis.  Rickert was encouraged  to maintain her normal activity throughout her chemotherapy regimen.  Filing No. 67-3 (Medical records), at CM/ECF pp. 13-16.

-4-

Rickert's cancer treatment did cause fatigue.  She was unable to stand or walk for any length of time, and needed to sit during practices and while at work.  It was difficult for her to carry out daily functions, and she was exhausted by night.  She lost her hair, her food occasionally tasted like metal, and she experienced other minor side effects.  Filing Nos. 60-3 (Rickert depo.), at 23:8-14; 67-2 (Rickert declaration), at ¶¶ 11-13; 67-2 (Sullivan depo.), at 19:7-25.

Rickert did not, however, miss any work as either the part-time head volleyball coach or the part-time Student Activities Director due to her cancer treatment, in part because her volleyball team changed the practice schedule to accommodate Rickert's medical appointments.   Filing Nos. 60-3 (Rickert depo.), at 14:4-15; 15:7-10; 20:14-17; 23:8-14; 24: 2-10); 60-16 (News article); 67-2 (Rickert declaration), at ¶ 9; 67-9 (Wuestewald declaration), ¶ 4. From the onset of Rickert's breast cancer and throughout her treatment, Rickert could fully perform her job, and although co-employees asked Rickert if she wanted to go home and rest out of concern for her well-being, no one at Midland criticized her or stated she was unable to perform her job due to her cancer or the treatment side-effects.  Filing No. 60-3 (Rickert depo.), at 19:3-27:4.

Rickert had breast reconstruction surgery on January 4, 2004.  Since the surgery was performed during interterm, she missed no work as a Student Activities Director because there were no ongoing activities, and she missed no work as a volleyball coach because it was off-season.  Filing No. 67-2 (Rickert declaration), at ¶ 10.  By March 2, 2004, the plaintiff was reportedly "doing well," with no symptoms, her only complaint being the resumption of menses.  Filing No. 67-3 (Medical records), at CM/ECF p. 27.  The plaintiff was prescribed additional medications to suppress her ovaries and advised to follow up every three months. Filing No. 67-3 (Medical records), at CM/ECF p. 27.

On March 23, 2004, Tara Knudson-Carl ("Knudson-Carl") was hired as Vice-President of Student Development at Midland and became the plaintiff's supervisor in plaintiff's capacity as part-time Student Activities Director. Filing Nos. 60-3 (Rickert depo.), at 27:5-8; 67-2 (Rickert declaration), at ¶ 31. When Knudson-Carl began the position, she stated that if the budget allowed, she intended to make the Student Activities Director position full-time. Filing No. 60-3 (Rickert depo.), at 63:4-15. However, Knudson-Carl advised Rickert that Knudson-Carl would wait a year to see if Rickert could handle both the part-time volleyball head coaching duties and the parti-time Student Activities Director duties. Filing No. 67-2 (Rickert declaration), at ¶ 31. Knudson-Carl knew the plaintiff had breast cancer and was undergoing breast cancer treatment. Filing No. 60-3 (Rickert depo.), at 27:7-16.

Rickert was seen by her doctor for follow up in May and August 2004. Other than "tolerable" hot flashes, likely induced by medications used to induce menopause, Rickert was "doing well." Filing No. 67-3 (Medical records), at pp. 29, 31.

Rickert spoke with Schneider in August 2004 and told him she was being treated for her cancer, and would continue receiving injections and medications for the following five years. Filing No. 60-3 (Rickert depo.), at 57:12-59:23; Filing No. 67-2 (Rickert declaration), at ¶ 32. The expression on Schneider's face indicated he was not happy to hear this news. Filing No. 67-2 (Rickert declaration), at ¶ 32.

In September 2004, less than six months after Knudson-Carl was hired, Knudson-Carl advised Rickert that since there was no Dean of Students at the time, there was money in the budget to make the Student Activities Director a full-time position. Filing No. 67-2 (Rickert declaration), at ¶ 34. Knudson-Carl told Rickert the part-time Student Activities Director position was being terminated and, as such, Rickert's employment in that position was terminated effective September 8, 2004. Filing No. 60-3 (Rickert depo.), at 43:23-45:4. Rickert's passion and vocation was for volleyball. Filing No. 60-3 (Rickert depo.), at 38:21-39:8. Knudson-Carl stated

Rickert could apply to be the full-time Student Activities Director, but probably would not want to because if hired. Rickert could not coach volleyball, and Rickert would probably get a full-time head volleyball coaching position at Midland when that job was created. Filing No. 60-3 (Rickert depo.), at 49:17-50:10. Rickert did not apply for the full-time position as Student Activities Director because had she been hired, she would have been required to quit coaching, which would have left her volleyball players without a head coach midway through their season. Filing Nos. 60-3 (Rickert depo.), at 47:7-52:10; 67-2 (Rickert declaration), at ¶ 37.

Midland hired Tara Mieras ("Mieras"), a woman under the age of thirty, as the full-time Student Activities Director. Filing Nos. 60-3 (Rickert depo.), at 52:11-17; 67-4 (NEOC statement), at CM/ECF p. 5. Rickert agrees Mieras appeared, on paper, to be qualified for the position. Filing Nos. 60-3 (Rickert depo.), at 55:12-25, 109:5-110:20; 60-12 (Mieras resume).

The Midland volleyball season was over in the beginning of November 2004. Filing No. 60-3 (Rickert depo.), 98:8-10. By the end of 2004, the plaintiff no longer had an office in Student Development since she was no longer employed as a part-time Student Activities Director. The athletic facilities were under construction and office space in the athletic department was so scarce that the offices of two assistant football coaches and the golf coach were located in converted closets or storage areas. Schneider could not immediately locate any available office space for the plaintiff, so he asked her to work from home by computer while he continued to look. Schneider tried to locate space on campus, but the only option available was in a house three blocks from the field house but close to the residential halls, a location allowing the plaintiff to have access to students. The plaintiff was provided an office in the house. The office was equipped with a single bulb hanging from the ceiling, a desk, two folding chairs, a computer, a file cabinet, a telephone, and a chair. This less than "ideal set-up" made it difficult for the plaintiff to communicate with her athletes and keep connected with the Midland coaching community, but it was the

-7-

best solution Schneider could find at the time.  Filing Nos. 60-3 (Rickert depo.), at 105:3-107:19; 60-4 (Schneider depo.), at 68:14-69:17, 81:16-82:11.

Rickert was concerned about losing her full-time benefits, including health care benefits, with the loss of her full-time employment.  Schneider and Crume worked with the Human Resources Department and made the plaintiff's part-time head volleyball coaching position a two-thirds time position so the plaintiff could earn more money and retain her benefits.  Schneider and Crume told the plaintiff that if she held some camps and club volleyball tournaments to raise money, then her salary could remain the same and she could retain her benefits.  Filing Nos. 60-3 (Rickert depo.), at 104:1-11; 60-4 (Schneider depo.), at 78:7-79:6.

During the 2003-2004 time frame, the focus of the Midland athletic department was changing.  In 2003, Steve Titus became the president of Midland.  Before Titus was president, the academic dean was in charge of athletics, but under Titus, Gene Crume became an executive vice president responsible for several departments, including the athletic department.  Schneider, the Athletic Director,  reported to Crume.  Filing Nos. 60-4 (Schneider depo.), at 16:2-19; 60-5 (Crume depo.), at 7:13-20; 60-7 (Bracker depo.), at 12:1-8.

At the outset of the Titus/Crume administration, approximately 35% of Midland's students were involved in athletics.  Filing No. 60-5 (Crume depo.), at 9:16-10:3. Titus and Crume therefore developed a strategic plan to strengthen the Midland athletic program as a means for recruiting athletically and academically better students.  Filing Nos. 60-4 (Schneider depo.), at 20:16-21:2; 60-5 (Crume depo.), at 10:4-24.  Significant facility upgrades were implemented, (filing nos. 60-4 (Schneider depo.), at 18:20-20:15; 60-5 (Crume depo.), at 12:16-13:25), and the athletic program was changed from an NAIA coaching model, where coaches both taught and coached, to an NCAA model, where coaches had limited or no teaching responsibilities, and coached and recruited on a full-time basis.  Filing No. 60-4

-8-

(Schneider depo.), at 20:21-21:2, 39:15-40:7, 47:16-48:8; 60-7 (Bracker depo.), at 14:1-7.  As part of Titus/Crume strategic plan, the head volleyball coaching position was changed from part-time to full-time and a full-time track coach was hired.  Filing No. 60-4 (Schneider depo.), at 42:4-43:9.

Crume's two preferred options for hiring a coach were to either use a search committee or hire an identified candidate with a known record of success.  Filing No. 60-5 (Crume depo.), at 16:2-17.  The majority of head coach hires made by Schneider were done through the committee process, including when Jeff Field[1] was hired as the head baseball coach, and when Dan Sullivan, who was a part-time soccer coach, was hired as a full-time soccer coach.  Filing No. 60-4 (Schneider depo.), at 48:9-50:8. Schneider also formed a committee to hire an assistant head football coach in preparation for Schneider's possible departure as head football coach to become the full-time Student Activities Director, and the anticipated need to transition the assistant head football coach to head football coach when that occurred.  Filing No. 60-4 (Schneider depo.), at 35:5-15.   The search committee process was not used when Justin Horner was hired as the head track and field coach, either because the retiring coach had worked with and recommended Horner as his replacement and therefore no search committee was formed, or because the committee was formed but no other  qualified applicants applied.  Filing Nos. 60-4 (Schneider depo.), at 50:10-12; 60-5 (Crume depo.), at 20:3-21:3.

In December 2004, Schneider advised Rickert that the head volleyball coaching position would be made full-time, a five-person search committee would interview the applicants, and the plaintiff could apply for the position.  Filing No. 60-4 (Schneider depo.), at 48:13-50:24.  When the plaintiff asked why the position was being opened for applications, and why she needed to apply if she was already doing

---

[1]The record includes portions of the deposition of John Erick Field, who goes by Jeff Field.  Filing No. 60-9 (Field depo.), at 4:7-9.

the job, Crume stated Midland "wanted to just see if there was something better out there," and Schneider stated "they wanted to move in a different direction."  Filing Nos. 60-3 (Rickert depo.), at 63:22-64:21, 111:12-112:13; 67-2 (Rickert declaration), at ¶¶ 43-44.

Volleyball was a revenue-producing sport for Midland, and Crume had concluded the plaintiff was an average coach who had become the part-time head volleyball coach primarily by happenstance.  He did not believe the plaintiff's coaching style was well-organized or focused, and he wanted better results in the area of recruiting and inspiring students to remain engaged in the program.  During prior evaluations, the plaintiff was told she was underperforming in the area of recruiting.  Midland was investing significant resources in the volleyball program.  The arena facilities were being upgraded, and with the change from a part-time to full-time volleyball coach, Crume expected a substantially different commitment and sense of dedication to the program.  Crume wanted to select a better than average head volleyball coach from a robust pool of potential applicants.  Filing Nos. 60-3 (Rickert depo.), at 83:12-17; 60-5 (Crume depo.), 22:3-19, 23:17-24:6, 24:11-15, 26:3-21; 60-6 (Kramme depo.), at 19:7-18; 60-7 (Bracker depo.), at 25:13-24.

The application process began.  The position was advertised and was different than other coaching positions on the campus in that it consisted of 90 to 95 percent coaching and recruiting responsibilities with very minimal teaching.  Filing Nos. 67-2 (Rickert declaration), at CM/ECF p. 23; 67-8 (Job description); 70-2 (Job advertisement).  A master's degree was preferred, but only a bachelor's degree was required.  Applications were due by January 31, 2005.  Filing No. 70-2 (Job advertisement).

The search committee members were Midland coaches, including Keith Kramme, head softball coach and assistant athletic director; Joanne Bracker, head women's basketball coach; Jeff Field, baseball coach; Casey Thiele; and Becky

Wuebben,[2] athletic trainer.  Filing No. 60-3 (Rickert depo.), at 66:6-67:24.  Kramme served as the committee chairperson., and the other committee members forwarded their comments to him.  Filing Nos. 60-6 (Kramme depo.), at 16:25-17:3; 60-7 (Bracker depo.), at 27:2-14.  From the applications received, the search committee identified five candidates for interviews; Kerry Beidlemann, Kristen Lebeda, Mike Meyer, Pam Wendel, and the plaintiff.  The committee interviewed the five candidates and reviewed each candidate's resume, references, and letter of application.  The candidates also met with the volleyball players, who were afforded the opportunity to identify the pros and cons for each applicant.  Background checks were performed.  Filing Nos. 60-5 (Crume depo.), at 26:22-27:14;  60-6 (Kramme depo.), at 30:15-33:10, 36:8-12, 36:25-38:19; 60-10 (Tally sheet); 60-14 (Player evals).

Biedlemann was 26 years old.  Field identified Biedlemann's positive traits to include her "youth," experience in the sport, and the fact that she was new to the college and conference.  Her youth was considered a positive because "she was vibrant," and likely a "go-getter."   However, Field questioned whether Biedlemann would connect to and understand the students, and as negative factors, noted she was engaged to a coach (and therefore would be more likely to move), and did not interview well.  Filing Nos. 67-2 (Field depo.), at 33:24-34:14; 67-10 (Field emails), at CM/ECF p. 1.  Bracker believed Biedlemann's portfolio was extremely impressive, and she was highly articulate and very responsive to questions.  Filing No. 60-7 (Bracker depo.), at 33:3-20.   Kramme  considered  Beidlemann  a  "very  strong candidate top to bottom," with a tremendous portfolio and a background of successes with the program at the University of Nebraska at Kearney.  Filing No. 60-6 (Kramme depo.), at 51:21-52:4.  Thiele believed Biedlemann's positive traits included being

_____

[2]Between the time of serving on the search committee and the date of her deposition, Becky Wuebben was married.  Her name at the time of her deposition was Rebecca Jane Sullivan.  Filing Nos. 60-7 (Bracker depo.), at 23:5-10; 67-2 (Rickert declaration), at CM/ECF p. 52.

organized, having experience in a successful college volleyball program, and her likely ability to recruit.  Thiele further noted however, that Biedlemann had no contacts with the Fremont, Nebraska community, lacked familiarity with the Midland program or the NAIA model, and appeared to be looking for more money than Midland could offer.  Filing No. 67-6 (Thiele emails), at CM/ECF p. 1.

As to Lebeda, who was 25 years old, Thiele noted as beneficial her experience as a player and her Omaha club connections, both considered helpful for recruiting, but felt she was inexperienced, unfamiliar with running a Junior Varsity program, and did not adequately research Midland before her interview.  Filing Nos. 60-7 (Bracker depo.), at 44:24-45:2; 67-6 (Thiele emails), at CM/ECF p. 2. See also, Filing No. 60-11 (Lebeda resume and references).  Field did not believe Lebeda interviewed well, and based on the interview, did not believe she could handle coaching a small college program.  Filing Nos. 67-2 (Field deposition), at 20:21-21:2, 36:3-14; 67-4 (NEOC statement), at CM/ECF p. 5.

Thiele believed Wendel was a strong candidate, in the top third, whose drawback was a lack of coaching experience at the collegiate level, (filing no. 67-6 (Thiele emails), at CM/ECF p. 4).  Bracker, who had previously worked with Wendel, considered Wendel an outstanding candidate, who had experienced success at the high school level, and was intelligent, articulate, and organized.  Filing No. 60-7 (Bracker depo.), at 41:12-15, 42:15-19.

Meyer, who was in his mid-forties or fifties, was considered  a "very strong candidate," who would be "would be hard to beat."  Filing Nos. 60-6 (Kramme depo.), at 49:9-17; 60-7 (Bracker depo.), at 37:24-38:9; 67-6 (Thiele emails), at CM/ECF p. 3.

As to the plaintiff, Bracker, who was sixty and a good friend of Rickert at the time of the interviews, was extremely impressed with Rickert's commitment to

-12-

Midland during her health issues and considered this a positive character trait.  Filing No. 60-7 (Bracker depo.), at 40:9-25, 43:6-12, 51:23-24.  Kramme believed the plaintiff was a successful coach but was concerned she lacked control over her team. Filing No. 60-6 (Kramme depo.), at 43:12-24, 58:23-29:8.  Thiele considered, as a positive, that Rickert had gone through a very tough time with her illness and remained very loyal to the school.  However, he noted her resume and cover letter had typographical errors, she acknowledged having conflicts within her team every year, and her first recruiting class was her best, leading him to question if she would allow recruiting to slip even further in the future.  He also believed her practices were disorganized.  Filing Nos. 60-8 (Thiele depo.), at 12:19-13:5, & at CM/ECF p. 4; 67-2 (Rickert declaration), at ¶ 47:24-48:5.  Like Thiele, Field considered Rickert's positive traits to include her loyalty to Midland, and the fact she knew the current players and is a good person.  However, Field believed Rickert was unorganized and not concerned enough with winning, and while she corrected some problems in the program, she had failed to move the program forward.  Filing No. 60-9 (Field depo.), at 27:22-28:18 & CM/ECF p. 4.  Wuebben reiterated the positive traits identified by Thiele and Field, further adding the players liked her, Rickert believed academics were important, her retention was good, and she gave a lot to the school during her illness.  Wuebben believed, however, that the plaintiff lacked team control and had two sets of rules depending on whether the player was on scholarship.  Filing No. 67-2 (Rickert declaration), at CM/ECF p. 31.  Wuebben noted the search committee process was hard for her, and she was "just sick about this."  Weubben believed Rickert should have been appointed to the full-time position rather than having to

-13-

compete.[3]  Filing Nos. 67-2 (Rickert declaration), at CM/ECF p. 31; 67-2 (Sullivan depo.), at 21:10-16.  See also, Filing No. 60-13 (Rickert resume).

The players identified Rickert's strengths to include a familiar coaching style and her willingness to educate herself.  Their identified concerns included favoritism, inconsistency, recruiting issues, and knowledge.  Filing No. 60-3 (Rickert depo.), at 84:10-91:23; 60-14 (Player evals).  Similar issues were identified in a parent letter sent to Titus on May 15, 2003, but the letter was never discussed with the plaintiff.  Filing Nos. 60-3 (Rickert depo.), at 124:9-25; 60-15 (Parent letter).

Rickert has a "gut feeling" that the selection committee members considered her age as a factor in the hiring process.  Filing No. 60-3 (Rickert depo.), at 68:21-73:12, 77:3-80:7.  However, the only reference to age was Field's positive comment on Beidlemann's "youth."  Field also stated Lebeda may be too young and immature for the job.  Filing No. 60-3 (Rickert depo.), at 78:1-79:5.  Rickert's age was never discussed by the committee.  Filing No. 60-7 (Bracker depo.), at 51:25-52:9.  There is no evidence Rickert's breast cancer was identified as an impediment or discussed as limiting the plaintiff's ability to be the full-time head volleyball coach.  Filing Nos. 60-6 (Kramme depo.), at 43:7-11; 67-2 (Thiele depo.), at 53:13-24; 67-2 (Field depo.), at 32:22-33:2.

---

[3]The plaintiff's declaration contains not only her personal knowledge, but also her interpretation of the deposition testimony of other witnesses.  Some of that deposition testimony was offered as evidence; some was not.  The plaintiff's declaration states Wuebben testified she ranked the plaintiff as her first choice for the full-time head volleyball coach position.  Filing No. 67-2 (Rickert declaration), at ¶ 52.  The Wuebben testimony of record does not support this statement.  See Filing No. 67-2 (Rickert declaration), at CM/ECF pp. 52-54. Wuebben's email to Kramme, which is part of the record,  stated Wuebben was "just sick about" having to make a decision, and was "still thinking on this."  Filing No. 67-2 (Rickert declaration), at CM/ECF p. 31.

The interviews were conducted during February of 2005. See filing nos. 67-2 (Rickert declaration), at CM/ECF p. 31; 67-6 (Thiele emails); 67-10 (Field emails). In the end, Beidlemann was the committee's first choice, followed by Meyers and Lebeda. Rickert was the committee's fourth choice. These choices were forwarded to Schneider. The final decision was left to Crume, who relied heavily on Schneider's opinion. Filing Nos. 60-5 (Crume depo.), at 28:15-32:8; 60-6 (Kramme depo.), at 33:8-10; 60-7 (Bracker depo.), at 43:5-14.

Beidlemann withdrew from consideration because she accepted a job offer from Drake University. Meyer was withdrawn from consideration following a reference check. Lebeda was offered the position and accepted it, the job to commence on June 1, 2005. Filing No. 60-6 (Kramme depo.), at 47:17-49:25. Rickert admits that on paper, Lebeda appeared to be very qualified for the job. Filing No. 60-3 (Rickert depo.), at 94:22-25. Rickert was told in March 2005 that her contract for the head volleyball coaching position would not be renewed. Filing No. 67-2 (Rickert declaration), at ¶ 53.

By the time the application process began for the full-time head volleyball coaching position, the plaintiff had no recurrence of breast cancer, and although she remained on medication, she was having no symptoms associated with the disease or its treatment. Filing No. 67-3 (Medical records), at CM/ECF p. 33. During the application process, Rickert's stamina was reportedly "excellent" and she was "feeling fine." Filing No. 67-3 (Medical records), at CM/ECF p. 34. Rickert continued to be "active with good performance status" when her Midland employment ended on May 31, 2005, Filing Nos. 60-3 (Rickert depo.), at 9:8-25, 16:22-17:7, 94:16-25; 67-3 (Medical records), at CM/ECF p. 37.

LEGAL ANALYSIS

I.     <u>The Americans With Disabilities Act, and the Nebraska Fair Employment Practice Act</u>.

The defendant claims plaintiff's disability discrimination claims ADA claim must be denied, as a matter of law, because the plaintiff is not disabled as that term is defined under the ADA and the NFEPA, and there is no evidence of a causal connection between the plaintiff's alleged disability and the defendant's hiring decisions. The defendant further claims it has advanced a legitimate, nondiscriminatory reason for failing to hire the plaintiff as either a full-time Student Activities Director or a full-time head volleyball coach, and the plaintiff has offered no evidence that the defendant's stated reason is a mere pretext for discriminatory conduct.

An ADA plaintiff bears the initial burden of proving a prima facie case of discrimination. If the plaintiff meets this burden, then the employer has the burden to articulate a legitimate, nondiscriminatory reason for the adverse employment action. If the defendant meets this burden, the plaintiff must then show that the defendant's proffered reason was a pretext for discrimination. <u>Dovenmuehler v. St. Cloud Hosp., 509 F.3d 435 (8th Cir. 2007)</u>.

A.    Retroactive Application of the Americans with Disabilities Amendments Act of 2008.

The initial question the court must address is whether the Americans with Disabilities Amendments Act of 2008, (<u>Pub.L. No. 110-325</u>, <u>122 Stat 3553</u>), is applicable to the plaintiff's claims. The defendant claims the 2008 amendments cannot be retroactively applied; the plaintiff argues she is entitled to relief under both the pre-amendment and post-amendment ADA.

-16-

Absent express statutory language to the contrary, there is a presumption that statutes affecting substantive rights, liabilities, or duties will not be applied to conduct occurring before the statutes were enacted. Gross v. Weber, 186 F.3d 1089, 1091 (8th Cir. 1999). The Americans with Disabilities Amendments Act of 2008 contains no language indicating retroactive application was intended. To the contrary, the amendments were enacted on September 25, 2008, but were not effective until January 1, 2009. Pub.L. No. 110-325, § 8, 122 Stat 3553, 3559. By delaying the effective date, Congress clearly indicated the amendments were not intended to merely "clarify" the meaning of the current ADA statutes, but to apply a new law beginning on January 1, 2009. Lytes v. DC Water and Sewer Authority, 572 F.3d 936, 940 (D.C. Cir. 2009).

Under the pre-amendment version of the ADA, to prove she was "regarded as" disabled, the plaintiff had to show she was perceived as having an impairment that substantially limited a major life activity such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, and learning, (Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 195 (2002); 28 C.F.R. § 36.104)), or working in a substantial class or broad range of jobs. Sutton v. United Air Lines, Inc., 527 U.S. 471, 491 (1999). However, under the Americans with Disabilities Amendments Act of 2008:

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

42 U.S.C. § 12102(3). The express intent of the 2008 amendments was to expand the scope of the ADA by enacting legislation that effectively overruled the holdings in Sutton and Toyota Motor, and reinstated the broad view of "regarded as" disabled

-17-

set forth in School Board of Nassau County v. Arline, 480 U.S. 273 (1987). Pub.L. No. 110-325, § (2)(b)(3).

For the purposes of determining if the Americans with Disabilities Amendments Act of 2008 is retroactively applicable, the court assumes the amendments expand the ADA definition of "regarded as" disabled as Congress intended, and accordingly the scope of acts for which an employer may be liable under the ADA. Considered as such, the amendments attach "new legal consequences to events completed before [their] enactment." Landgraf v. USI Film Products, 511 U.S. 244, 270 (1994) (holding the provisions of the Civil Rights Act of 1991, which created a right to recover compensatory and punitive damages for certain violations of Title VII and provided for a jury trial if damages are claimed, cannot be applied retroactively).

The alleged discriminatory acts set forth in Rickert's complaint occurred prior to January 1, 2009. In accordance with the "well-settled presumption against application of . . . new statutes that would have genuinely 'retroactive' effect," (Landgraf , 511 U.S. at 277), the court finds the Americans with Disabilities Amendments Act of 2008 is not applicable to alleged discriminatory acts that occurred prior to January 1, 2009. See e.g., Lytes, 572 F.3d at 940 (holding ADA amendments which broadened the class of employees entitled to reasonable accommodations did not apply retroactively); Milholland v. Sumner County Bd. of Educ., 569 F.3d 562, 565 (6th Cir. 2009) (holding the ADA amendments, which no longer required a plaintiff bringing a claim under the "regarded as" prong to show she was perceived to have an impairment limiting a major life activity, did not apply retroactively); E.E.O.C. v. Agro Distrib. LLC, 555 F.3d 462, 469 n. 8 (5th Cir. 2009) ("Congress recently enacted the the ADA Amendments Act of 2008, . .  but these changes do not apply retroactively."). See also, AT & T Corp. v. Hulteen, 129 S.Ct. 1962, 1971 (2009) (holding the Pregnancy Discrimination Act could not be applied retroactively to recharacterize acts which were legal when performed as illegal

-18-

discrimination); Gross v. Weber, 186 F.3d 1089 (8th Cir. 1999) (holding the Violence Against Women Act was not retroactively applicable where the Act created a federal cause of action to recover damages for violence and lacked any clear expression that Congress intended retroactive application).

The court will therefore apply only pre-amendment ADA law in evaluating Rickert's claims for relief, and only the ADA law as it existed prior to January 1, 2009 will be discussed hereafter.

B.     The Plaintiff's Prima Facie Case.

To recover under the ADA, the plaintiff must make a prima facie showing that she:  1) has a disability as defined in 42 U.S.C. § 12102(2); 2) is qualified to perform the essential functions of the job, with or without reasonable accommodation; and 3) has suffered adverse employment action because of her disability. Kozisek v. County of Seward, Nebraska, 539 F.3d 930, 934 (8th Cir. 2008); Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1112 (8th Cir. 1995).[4]

---

[4]Since the disability discrimination provisions in the NFEPA are patterned after the pre-amendment ADA, the statutory definitions of "disability" and "qualified individual with a disability" contained in the NFEPA are virtually identical to the definitions of the ADA, and the Nebraska courts look to federal ADA decisions when interpreting NFEPA, the analysis of plaintiff's ADA and NFEPA claims is the same and these claims will not be separately discussed. Orr v. Wal-Mart Stores, Inc., 297 F.3d 720, 723 (8th Cir. 2002).

The plaintiff is disabled within the meaning of the ADA if she demonstrates she:  1) actually has a physical or mental impairment which substantially limits one or more of her major life activities, 2) has a record of such an impairment, or 3) is regarded as having such an impairment.   Amir v. St. Louis University,  184 F.3d 1017, 1027 (8th Cir. 1999).

1.      Actual Disability.

It is undisputed that the plaintiff's treatment for breast cancer was ongoing at the time she was terminated as a part-time Student Activities Director, was not hired as either the full-time Student Activities Director or the full-time head volleyball coach, and her contract as part-time head volleyball coach was not renewed. However, an individual cannot prove she has an actual disability by "merely submitting evidence of a medical diagnosis of an impairment."  Ristrom v. Asbestos Workers Local 34 Joint Apprentice Committee, 370 F.3d 763, 769 (8th Cir. 2004).

> [T]he ADA requires those claiming the Act's protection to prove a disability by offering evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial.  In other words, the relevant inquiry when addressing the major life activity of performing manual tasks is whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with his specific job. The type of evidence most relevant to establishing a substantial limitation in the major life activity of performing manual tasks, includes, for example, an individual's ability to do household chores, bathe, brush one's teeth, prepare meals, do laundry, etc.

Philip v. Ford Motor Co., 328 F.3d 1020, 1024-25 (8th Cir. 2003)(internal citations and quotations omitted).  An individualized assessment of the plaintiff's limitations is particularly necessary when the symptoms caused by an illness vary widely from person to person.  Ristrom, 370 F.3d at 769.

The plaintiff missed no work as a result of her cancer surgeries or the treatments that followed.  She received four chemotherapy treatments, but these treatments were completed by late September 2003, within three months following her initial cancer surgery.  During the chemotherapy regimen, the plaintiff experienced hair loss, loss of appetite, and nausea, and her food had a metallic taste, but based on the plaintiff's medical records, these symptoms did not significantly impair the plaintiff's ability to perform major life activities.  Filing No. 67-3 (Medical records), at CM/ECF pp. 12-16.  As of September 30, 2003, the plaintiff "continue[d] to be active with good performance status."  Filing No. 67-3 (Medical records), at CM/ECF p. 15.   The plaintiff experienced significant fatigue while receiving chemotherapy, and felt exhausted by the evening, but she never missed a day of work due to her illness or its treatment.  Following the completion of her chemotherapy treatments, the plaintiff received medications to induce menopause and experienced hot flashes.  However, the hot flashes ranged from "tolerable," (filing no. 67-3 (Medical records), at CM/ECF p. 31),  to "mild," (Filing No. 67-3 (Medical records), at CM/ECF p. 38), and at times, were nonexistent, (filing no. 67-3 (Medical records), at CM/ECF p. 33).  The plaintiff's has failed to show her breast cancer or the effects of her cancer treatment substantially impaired her ability to perform any major life activities.  Liljedahl v. Ryder Student Transp. Services, Inc., 341 F.3d 836, 841 (8th Cir. 2003)(holding the  record did not support finding plaintiff's cancer materially limited a major life activity where the cancer surgery was successful and the recuperation period was limited); Ellison v. Software Spectrum, Inc.,  85 F.3d 187 (5th Cir. 1996)( holding plaintiff's breast cancer was an "impairment" within the meaning of the ADA, but the plaintiff failed to show it substantially limited the major life activity of work, because although she constantly felt sick and fatigued, and suffered nausea, fatigue, swelling, inflammation and pain as result of her treatment and medication, she could perform her essential job responsibilities with a modified work schedule); Madjlessi v. Macy's West, Inc., 993 F. Supp. 736 (N.D.Cal. 1997)(holding the plaintiff did not show her breast cancer substantially limited the major life activity of work where she worked as usual except for four days a month

-21-

while undergoing chemotherapy; the side effects of vomiting, weakness and nausea did not satisfy the standard of substantially limiting a major life activity).

2.   Record of Disability.

The ADA proscribes discrimination based upon a documented history of having a physical or mental impairment that substantially limits one or more of the major life activities.  Weber v. Strippit, Inc., 186 F.3d 907, 915 (8th Cir. 1999).  To have a record of disability under the ADA, the plaintiff's medical documentation must show she has a history of, or has been mis-classified as having, a physical or mental impairment that substantially limits one or more major life activities.  Weber, 186 F.3d at 915 (citing 29 C.F.R. § 1630.2(k)).  As previously discussed, Rickert's medical documentation of record fails to show a major life activity was substantially impaired by her breast cancer or its treatment.  Being hospitalized for short periods of time, taking medications, and receiving treatments does not in and of itself establish a record of substantially limited major life activities.  Heisler v. Metropolitan Council, 339 F.3d 622, 630 (8th Cir. 2003).

3.   Perceived Disability.

To prove her rights under the ADA were violated because Midland "regarded" her as disabled, the plaintiff must prove Midland mistakenly believed the plaintiff had an impairment, or that it mistakenly believed the impairment the plaintiff actually had substantially limited her ability to perform her job.  The ADA's "provision addressing perceived disabilities is intended to combat the effects of archaic attitudes, erroneous perceptions, and myths that work to the disadvantage of persons with or regarded as having disabilities."  Breitkreutz v. Cambrex Charles City, Inc., 450 F.3d 780, 784 (8th Cir. 2006).

-22-

"The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." Breitkreutz, 450 F.3d at 784. To find Rickert is substantially limited in her ability to work requires a showing that her overall employment opportunities were limited. Thus, Rickert must present evidence that Midland believed she was unable to perform a broad range of jobs or a substantial class of jobs to show Midland regarded her as disabled.

There is no evidence Midland believed the plaintiff could not perform as a full-time Student Activities Director or as a full-time head volleyball coach due to her illness or its treatment, much less a broad range or class of employment positions. The plaintiff admits she was told she could apply to be the full-time Student Activities Director, but she would have to give up volleyball coaching, her passion, if she got the job. The plaintiff admits she did not apply for the full-time Student Activities Director position because she did not want to quit coaching mid-season. Although the plaintiff claims Knudson-Carl changed the part-time Student Activities Director position to a full-time position six months early, and then discouraged the plaintiff from applying to be the full-time Student Activities Director, assuming these facts to be true for the purposes of this motion, Rickert has presented no evidence that Knudson-Carl did so because she perceived the plaintiff as unable to perform the Student Activities Director job due to cancer or its treatment.

Rickert claims Midland refused to hire her as a full-time head volleyball coach and failed to renew her head volleyball coach contract because it regarded her as disabled. To the contrary, the members of the Midland search committee knew of the plaintiff's past illness and ongoing treatment, yet she was selected from the applicant pool as one of the five candidates interviewed. The plaintiff claims Midland employees and her supervisors knew she was experiencing symptoms, and this knowledge is evidence she was regarded as disabled. However, "[a]n employer's knowledge that an employee exhibits symptoms which may be associated with an impairment does not necessarily show the employer regarded the employee as

-23-

disabled." Webb v. Mercy Hosp., 102 F.3d 958, 960 (8th Cir. 1996).   Based on the evidence of record, the fact that Rickert continued to do her job and never missed a day of work while being treated for breast cancer was identified as a positive trait, not a negative trait, by the search committee, and was "inspiring" to most of those working at Midland, including Schneider, the Athletic Director.   Filing No. 60-4 (Schneider depo.), at 82:24-83:2.  Midland did not regard the plaintiff as disabled from performing a class of jobs, a broad range of jobs, or even the specific job of full-time head volleyball coach.

The plaintiff has failed to produce evidence showing she was actually disabled, regarded as disabled, or had a record of disability within the meaning of the ADA or NFEPA while working for Midland.  She has therefore failed to make a prima facie showing of "disability," a threshold element of a disability discrimination for which the plaintiff bears the burden of proof.[5]   The defendant is entitled to judgment as a matter of law on the plaintiff's claim for recovery under the ADA and NFEPA.

II.    The Age Discrimination in Employment Act, and the Nebraska Age Discrimination in Employment Act.[6]

Where, as in this case, the plaintiff presents only circumstantial evidence of age discrimination, the court applies the burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Loeb v. Best Buy Co., Inc.,  537 F.3d 867, 872

---

[5]Since the plaintiff has failed to prove she has a "disability" as defined under the ADA and NFEPA, the court need not and will not discuss the remainder of the defendant's arguments, including its argument that no causal connection exists between plaintiff's "disability" and any alleged adverse employment actions.

[6]The NADEA closely parallels and is interpreted in conformity with the ADEA. Allen v. AT & T Technologies, Inc., 228 Neb. 503, 506, 423 N.W.2d 424, 427-28 (1988).  Therefore, the analysis of plaintiff's federal and state age claims is the same, and these claims will not be separately discussed.

-24-

(8th Cir. 2008).   Under the McDonnell Douglas analysis, the plaintiff must first present a prima facie case of discrimination.  If Rickert meets this burden, Midland must present evidence of a legitimate, nondiscriminatory reason for failing to hire the plaintiff as the full-time Student Activities Director or full-time head volleyball coach.  If Midland meets this burden, then to avoid summary judgment, the plaintiff must present some evidence that Midland's proffered nondiscriminatory reasons were pretextual and age played a role in deciding not to hire the plaintiff.  Loeb, 537 F.3d at 872-3.

The ADEA prohibits an employer from refusing to hire an individual who is at least forty years old because of the applicant's age.  Wingate v. Gage County School Dist., No. 34, 528 F.3d 1074, 1079 (8th Cir. 2008).  To raise a prima facie case of age discrimination under the ADEA, Rickert must show:  (1) she is a member of a protected age group (over forty); (2) she was otherwise qualified for the position; (3) she was not hired; and (4) Midland hired a substantially younger person to fill the position.  Wingate, 528 F.3d at 1079 (citing Chambers v. Metro. Prop. & Cas. Ins. Co., 351 F.3d 848, 856 (8th Cir. 2003)).  For the purposes of its motion for summary judgment, the defendant concedes the plaintiff has offered a sufficient prima facie showing as to both the full-time Student Activities Director and full-time head volleyball coach positions.  Filing No. 59, at CM/ECF p. 27.  Midland therefore must come forward with a legitimate, nondiscriminatory reason for failing to hire the plaintiff in these jobs.  "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence."  Davis v. KARK-TV, Inc., 421 F.3d 699, 705 (8th Cir.2005)

The plaintiff claims Knudson-Carl eliminated the part-time Student Activities Director position without affording the plaintiff a full twelve months to prove she could adequately perform the job on a part-time basis.  To the extent the plaintiff is claiming the change from part-time to full-time was discrimination based on age, the evidence establishes that from the outset, Knudson-Carl stated she intended to make

the position full-time when the budget allowed, extra money was available in the budget in September 2004, and consistent with Knudson-Carl's intent, the part-time position was eliminated in favor of a full-time Student Activities Director. The plaintiff has offered nothing to indicate the stated reason for the part-time to full-time transition was pretextual. As to any claim the Student Activities Director was made a full-time position in order to effectively eliminate the plaintiff from continued employment in that job, the defendant is entitled to judgment as a matter of law.

The plaintiff claims Knudson-Carl discouraged the plaintiff from applying to be the full-time Student Activities Director. However, the evidence establishes Knudson-Carl never stated Rickert could not apply for the job, and in any event, Knudson-Carl's statements were not the reason Rickert failed to apply. Rickert did not apply to be the full-time Student Activities Director because she did not want to leave her volleyball players without a head coach in mid-season. The plaintiff's failure to apply for the full-time Student Activities Director position is certainly a nondiscriminatory reason for not hiring the plaintiff to perform that job. Buchholz v. Rockwell Intern. Corp., 120 F.3d 146 (8th Cir. 1997)(holding employer articulated a specific, nondiscriminatory reason for failing to hire an applicant where the supervisors could not recall receiving the applicant's resume). See also, Cardenas v. AT & T Corp., 245 F.3d 994, 999 (8th Cir. 2001) (holding the plaintiff's absence from a promotability list was a legitimate, nondiscriminatory reason for defendant's failure to promote him).

Moreover, there is no evidence the plaintiff was more qualified than Tara Mieras, the person hired as the full-time Student Activities Director. The plaintiff acknowledges that at least on paper, Mieras appeared to be qualified for the job. If a comparison between the person hired and the plaintiff reveals only similar qualifications or that the plaintiff was not as qualified as the person hired, there is no inference of age discrimination. Wingate, 528 F.3d at 1080.

-26-

The defendant has offered legitimate, nondiscriminatory reasons for failing to hire the plaintiff as a full-time Student Activities Director.  The plaintiff has offered no evidence that these stated reasons were mere pretext for discriminatory conduct. The defendant is entitled to judgment as a matter of law on plaintiff's ADEA and NADEA claims for age discrimination related to the Student Activities Director position.

The plaintiff claims Midland refused to hire her as the full-time head volleyball coach based on age.  In support of this claim, she argues she was singled out because other coaches were hired without having to go through the search committee process, other full-time coaches were required to teach (which presumably would have limited the pool to those with master's degrees), she was already performing the position, and has a "gut feeling" Midland's desire to "see if there was something better out there," and "move in a different direction," (filing nos. 60-3 (Rickert depo.), at 63:22-64:21, 111:12-112:13; 67-2 (Rickert declaration), at ¶¶ 43-44), actually meant they wanted someone young to coach the volleyball team.  Rickert further claims she was afforded inferior office space and required to earn money to keep her benefits as part of Midland's pattern of discrimination.

The evidence reveals the search committee considered both objective and subjective factors and traits in comparing the candidates and recommending its choices.  Among the traits considered were organizational skills; stability and contacts with the community; loyalty to and knowledge concerning the Midland program and its players; prior experience as a player and coach;  community and school contacts, particularly as they related to access to recruiting venues and experience with quality teams; team control; and the ability to interact with the players. Midland offered evidence that on balance and in comparison to Biedlemann, Lebeda, and Meyer, Midland concluded Rickert was not the strongest candidate.  No one on the search committee questioned Rickert's loyalty to the school or her knowledge of the program or its players, and they admired her resilience and

-27-

commitment in continuing to coach throughout her cancer diagnosis and treatment, but they also noted she was unorganized, lacked team control, and was perceived to show favoritism.

Perhaps most importantly, Midland was changing its program, including upgrading facilities and hiring a full-time head volleyball coach, primarily to recruit better students, yet the plaintiff had been counseled to improve her recruiting and acknowledged her best recruiting year was her first year as a coach, leading at least one committee member to question whether she was able and willing to improve. See, Cherry v. Ritenour School Dist., 361 F.3d 474 (8th Cir. 2004)(holding school district's proffered reason for not renewing a counselor's contract, her failure to improve her performance in specified areas, was legitimate and nondiscriminatory). The full-time  position consisted of 90 to 95% coaching and recruiting, but Rickert was viewed by Crume as only an average coach and Rickert's recruiting skills were in question. Crume wanted more than an average coach, particularly since Midland was investing so much in the program.  In contrast to Rickert, the committee, Schneider and Crume concluded  Beidlemann and Lebeda were both able to coach with skills and experience gained from noted and touted outside volleyball programs, and both had connections to volleyball clubs and programs perceived as potentially valuable for future recruiting.  The plaintiff admitted that, on paper, Lebeda appeared very qualified for the position.  Although the plaintiff argues neither Beidlemann nor Lebeda were qualified for the full-time head volleyball coaching position because they lacked a master's degree and could not teach at Midland, both had a bachelor's degree, which was all that was required for the position because teaching was not a significant part of the job.

The plaintiff claims "youth" was considered a positive trait by the committee, and therefore age was considered when deciding not to hire the plaintiff.  While it is true Field listed "youth" as a positive trait for Beidlemann in his email to Kramme, Field was concerned Lebeda, who was approximately the same age as Biedlemann,

was too young and immature to perform the job.  Considered in the context of the record, Field's references to "youth" were made by one member of five-member search committee, and the committee never discussed age in reaching its recommendations, was not tasked with making the final hiring decision, and ranked Meyer, who was approximately the same age as Rickert, ahead of Lebeda.  On the record before the court, Field's stray references to "youth" are not sufficient evidence to prove intent to discriminate based on age or create a trial-worthy showing of pretext.  Buchholz v. Rockwell Intern. Corp.,  120 F.3d 146, 149 (8th Cir. 1997) (holding no discriminatory animus was shown where the plaintiff asked why he was not hired, and the hiring supervisor stated the "young kids" whom he hired "sure were sharp"); Smith v. Goodyear Tire & Rubber Co., 895 F.2d 467, 472 (8th Cir.1990) (stating that a single reference to age is insufficient evidence of an intent to discriminate); Merrick v. Farmers Ins. Group, 892 F.2d 1434, 1438 (9th Cir.1990) (holding an employer's stray comment stating an applicant was promoted because he was "a bright, intelligent, knowledgeable young man" is insufficient to support a finding of age discrimination).

The plaintiff argues Midland's discriminatory motives are evident from the way it treated the plaintiff after she lost her job as part-time Student Activities Director.  Specifically, the plaintiff claims she was forced to earn money to keep her benefits and was told to work from home and then given an ill-equipped and substandard office distant from other coaches and the field house.  However, based on the record, the plaintiff was told to organize and conduct  some revenue-producing camps and tournaments so she could be considered at least a two-thirds time employee and keep her benefits.  In other words, Midland was attempting to help the plaintiff by creating some work for her, and was simply asking the plaintiff to actually work two-thirds time if she was to receive the commensurate benefits.  The plaintiff has offered no evidence such conduct by Midland was a pretext for discrimination.

As to plaintiff's office accommodations, Midland had a serious shortage of office space available to the athletic department when Rickert needed an office. Rickert worked from her home and later had an office in a house; the golf coach and two assistant football coaches had offices in closets or storage rooms. The plaintiff has not shown her office arrangements had anything to do with age discrimination, or that the reasons Midland offered to explain plaintiff's office accommodations are mere pretext.

A search committee composed of Rickert's co-workers, most of whom considered the plaintiff a friend, interviewed five applicants, compared their qualifications, and decided three of the applicants were better choices for the position than the plaintiff, two of whom were substantially younger than the plaintiff, and one who was approximately the plaintiff's age. The plaintiff may disagree with Midland's decision,[7] but the courts do not "sit as super-personnel departments reviewing wisdom or fairness of employer's judgments unless they were intentionally discriminatory." Edmund v. MidAmerica Energy Co., 299 F.3d 679, 686 (8th Cir. 2002).

The defendant has offered evidence explaining legitimate, nondiscriminatory reasons for hiring Lebeda instead of the plaintiff as the full-time head volleyball coach. The plaintiff has offered no evidence that these reasons are a mere pretext for

---

[7]The plaintiff has offered win-loss and retention records to show Lebeda did not perform as well as Rickert had in the volleyball coaching position, in part to show Rickert was more qualified than Lebeda. See Filing Nos. 67-2 (Rickert declaration), at ¶¶ 61-64; 67-5 (Def's Interrog. Answers). This challenge to Midland's hiring decision, made with the benefit of hindsight, is irrelevant. The question is whether Midland considered disability or age when it was deciding not to hire the plaintiff. The plaintiff has presented no evidence that based on the information known by Midland at the time of hiring, plaintiff's age or alleged disability were considered, or that Rickert was more qualified than Lebeda to be the full-time head volleyball coach.

-30-

underlying discriminatory animus.  The defendant is entitled to judgment as a matter of law on plaintiff's ADEA and NADEA claims.  See e.g., Wingate, 528 F.3d at 1079 (granting summary judgment for the defendant where the defendant claimed, among other things, that the four individuals hired were better qualified for the positions, even though they were significantly younger, the plaintiff was considered only an average teacher and the defendant was seeking above-average teachers, and the plaintiff offered no evidence these stated reasons were mere pretext).

IT IS ORDERED:

1.    The defendant's motion for summary judgment, (filing no. 58), is granted.

2.    This case is dismissed in its entirety.

3.    Judgment shall be entered by separate document.

DATED this 2nd day of September, 2009.

BY THE COURT:

*Richard G. Kopf*
United States District Judge

-31-